IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>WORLDWIDE MACHINERY GROUP, INC., *et al.*<br><br>Debtors.[1]<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WORLDWIDE MACHINERY GROUP, INC., *et al.*,<br><br>Plaintiff,<br><br>-v-<br><br>KEY EQUIPMENT FINANCING, a division of KEYBANK NATIONAL ASSOCIATION, as Administrative Agent, GORDON BROTHERS COMMERCIAL & INDUSTRIAL LLC, and DOES 1 – 100,<br><br>Defendants. | Chapter 11<br><br>Case No. 25-90379 (CML)<br><br>(Jointly Administered)<br><br>Adv. Pro. _____ |

**COMPLAINT AGAINST KEY EQUIPMENT FINANCING, GORDON BROTHERS COMMERCIAL & INDUSTRIAL LLC, AND DOES 1 – 100**

The Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff"), by its undersigned counsel, derivatively on behalf of debtor Worldwide Machinery Group, Inc. ("Worldwide Machinery") and each of its debtor subsidiaries and debtor affiliates (collectively, the "Debtors," and together with their non-debtor subsidiaries and affiliates, "Worldwide" or the "Company"), as and for its complaint (the "Complaint") against the ABL Lenders and Gordon Brothers (as those terms are defined below), hereby alleges upon knowledge of its own acts and upon information and belief as to all other matters, as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Worldwide Machinery Group, Inc. (8029), Worldwide Machinery, Ltd. (3666), Worldwide Operating, Inc. (7023), and Worldwide Machinery GP, LLC (5399).  The location of Debtor Worldwide Machinery Group, Inc.'s corporate headquarters is 2200 Post Oak Boulevard, Suite 1000, Houston, Texas 77056.

## PRELIMINARY STATEMENT[2]

1. The Committee brings this action to recover damages from the ABL Lenders and Gordon Brothers for wrongfully conspiring to interfere with the Debtors' efforts to maximize the value of their estates and to equitably subordinate the ABL Lenders' claims, to which the Committee also objects.

2. For over a year, under newly-appointed independent management, the Debtors have diligently and responsibly sought to address their financial challenges by pursuing a going concern or asset monetization plan intended to maximize value for their stakeholders. To that end, the Debtors simultaneously engaged PSC to run a competitive sales process and Gordon Brothers and Hilco to help facilitate a possible liquidation. To insure that Gordon Brothers (and Hilco) and the Debtors did not work at cross purposes, the Debtors demanded, and Gordon Brothers agreed, that Gordon Brothers would refrain from, among other things, entering into any arrangement with any creditor relating to the claims of such creditor, or acquiring any beneficial ownership interest in any of the Debtors' securities or assets, including the debt issued by the Debtors (as further described and defined below, the "GB Restrictions").

3. The Debtors' effort bore fruit in the form of a credible going concern offer from Diversified and a credible liquidation offer from Hilco and Ritchie Brothers. The Debtors kept the ABL Lenders fully apprised of their efforts. In mid-August, the Debtors analyzed the competing approaches and offers and determined that the potential Going-Concern Transaction was best. Specifically, the Debtors determined that the Going-Concern Transaction would provide the Debtors with the greatest total economic value and would provide for higher and faster recoveries for the ABL Lenders and general unsecured creditors as compared to the Hilco/Ritchie Brothers Bid. The Debtors also identified several indirect, non-economic benefits of the Going-

---

[2] Capitalized terms not defined in this Preliminary Statement have the meanings ascribed to them below.

Concern Transaction, including operational continuity, the retention of approximately 70% of the Debtors' employees, and the avoidance of substantial costs and expenses required through a liquidation overseen in bankruptcy court.

4. Regrettably, Gordon Brothers breached the GB Restrictions by negotiating to purchase the debt held by the ABL Lenders.  Enticed by a potential quick exit, the ABL Lenders joined Gordon Brothers in the illicit scheme and attempted to force their contemplated debt sale on the Debtors by refusing to (a) extend the forbearance under which the Debtors had been operating for almost a year, (b) entertain any other transaction even if it maximized recoveries for all stakeholders, including themselves, (c) allow the Debtors to negotiate a satisfactory wind down or restructuring plan as a condition to the ABL Lenders' debt sale, or (d) indemnify the Debtors' officers and directors against any liability associated with waiving the GB Restrictions to the debt sale while having no plan for the "day after."  The ABL Lenders' efforts to subvert and circumvent the Debtors' going-concern sale process jeopardized not only that process, but also the Debtors' ability to continue as an operating entity, thus forcing this bankruptcy filing.

5. Based on the facts alleged below, the Committee asserts, on behalf of the Debtors' estates, claims against (a) the ABL Lenders for breach of the duty of good faith and fair dealing, tortious interference with the Debtors' contractual relations, equitable subordination, and disallowance of their claims; (b) Gordon Brothers for breach of contract; and (c) and against all Defendants for civil conspiracy.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action under 28 U.S.C. § 1334.  This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory predicates for the relief requested herein are sections 502, 510(c), 544, 550, and 551 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy

Code"), 28 U.S.C. §§ 2201 and 2202, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable New York law.

## THE PARTIES

8. Plaintiff was appointed by the Office of the United States Trustee for the Southern District of Texas pursuant to section 1102 of the Bankruptcy Code on September 23, 2025. Plaintiff is vested with, among other things, the powers described in section 1103 of the Bankruptcy Code, including the power to investigate the Debtors' acts, conduct, assets, liabilities, and financial condition.

9. Plaintiff brings this action on behalf of the Debtors' estates pursuant to that certain *Stipulation and Agreed Order Granting Leave, Standing, and Authority to the Official Committee of Unsecured Creditors to Prosecute Certain Claims*, which vested standing in Plaintiff to bring the claims asserted herein.

10. Defendant Key Equipment Financing (the "ABL Administrative Agent") is a division of KeyBank National Association and is the ABL Administrative Agent under that certain *Second Amended and Restated Credit Agreement* dated January 25, 2022, as amended, restated, supplemented, or otherwise modified (the "ABL Credit Agreement").

11. Defendants Does 1 – 100 are the lenders under the ABL Credit Agreement (and together with the ABL Administrative Agent, the "ABL Lenders").

12. Defendant Gordon Brothers Commercial & Industrial, LLC (together with any affiliates, "Gordon Brothers" and together with the ABL Lenders, the "Defendants") is a limited liability company that, upon information and belief, was formed under the laws of the State of Delaware.

## STATEMENT OF FACTS[3]

**A.   General Background**

13.     On September 11, 2025 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their property and are operating and managing their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Cases.

**B.   The Debtors' ABL Loan**

14.     On January 25, 2022, Debtors Worldwide Machinery, Ltd. and Worldwide Operating, Inc. (the "ABL Borrowers"), as borrowers and certain guarantors entered into the ABL Credit Agreement with the ABL Lenders, KeyBank National Association, as issuing bank and PNC Bank National Association, as Documentation Agent, pursuant to which the ABL Lenders extended a revolving line of credit due December 21, 2024 (the "ABL Loan") in the aggregate principal amount of up to $132.5 million (since reduced to $122.5 million). The ABL Loan is governed by New York law. The ABL Loan is purportedly secured by a first-priority lien on substantially all the assets, including receivables, of the Debtors pursuant to certain security documents (the "ABL Security Documents"), including the Security Agreement (as defined in the ABL Credit Agreement).

15.     For close to a year, the Debtors have been operating pursuant to a series of forbearance agreements and amendments with the ABL Lenders (the forbearance agreements, as amended and modified, the "Forbearance Agreements"). The last forbearance period under those agreements expired on September 5, 2025.

---

[3] Many of the facts set forth herein are based upon the allegations in the *Declaration of Scott Avila in Support of Debtors' Petitions and Requests for First Day Relief* [Bankr. Docket No. 19].

C.   **Events Leading to the Bankruptcy Filing**

16.   The Debtors are in the business of renting and selling heavy equipment to third parties. The Debtors have been operating for more than 75 years and have over 100 employees.

17.   The Debtors' business was adversely impacted by COVID and a catastrophic decline in the pipeline industry. Despite extensive efforts to restructure, the Debtors have been unable to recover from those impacts and defaulted on the ABL Loan in 2024.

18.   Prior to the default, the Debtors sought to hire an investment banker to raise capital or negotiate a sale of its assets, but the ABL Lenders blocked them from doing so. At the time, the Debtors had substantially more equipment than they do today, were not suffering from the same level of financial distress that they were on the Petition Date, and would have garnered a substantially higher price for their assets or as part of a going concern.

19.   The ABL Lenders did, however, consent to management changes. On August 15, 2024, the Debtors brought in Mr. John T. Young ("Mr. Young") to serve as an independent director. On October 7, 2024, Mr. Robert Warshauer ("Mr. Warshauer") was added as a second independent director. To strengthen the Debtors' governance, Mr. Warshauer joined Mr. Young to form a committee of the Board to oversee restructuring matters (the "Restructuring Committee"). Also on October 7, 2024, the Board appointed Scott Avila—a principal of Paladin Management Group—to serve as the Debtors' Chief Restructuring Officer.

20.   In January 2025, at the request of the ABL Lenders, the Debtors' majority equity owners—Alan Greenberg, Evan Greenberg, and Adam Greenberg (together, the "Greenbergs")—resigned from the Board and, according to the Debtors, have played no role in the Debtors' governance since that time.

21.   Shortly thereafter, the Debtors and the ABL Lenders agreed that a sale or liquidation of the Debtors or their assets would maximize value for creditors and other

stakeholders. To assist and advise on their going-concern sale process, the Debtors (acting at the direction of the ABL Lenders) retained Piper Sandler & Company ("PSC") to market the Debtors' assets on a going-concern basis.

22. To support a potential liquidation, the Debtors and Gordon Brothers entered into a non-disclosure agreement on January 28, 2025 (the "NDA") pursuant to which the Debtors would provide certain confidential information.  The Debtors contacted Gordon Brothers, Hilco and Ritchie Brothersto assist them with a potential liquidation, not to compete with them or pursue interests or potential transactions that the Debtors did not authorize.  Thus, to maintain control of the process and to prevent Gordon Brothers from misusing confidential information or otherwise engaging in unauthorized conduct inconsistent with its role as one of the Debtors' advisors, the Debtors bargained for explicit restrictions on Gordon Brothers' activities which were memorialized in the NDA.

23. Among other things, Gordon Brothers expressly agreed in the NDA that it would not, without the Company's prior written consent, (a) initiate or maintain contact with anyone for the purpose of purchasing any indebtedness from any of the Debtors' creditors, (b) enter into any arrangement with any creditor relating to the claims of such creditor, or (c) acquire, offer, or propose to offer, directly or indirectly, any beneficial ownership interest in any of the Debtors' securities or assets (collectively, the "GB Restrictions").

24. Ultimately, with the ABL Lenders' consent, the Debtors simultaneously ran going concern and liquidation sales processes.  With respect to a potential going concern transaction, PSC received two indications of interest on July 6, 2025.  One was deemed uncompetitive.  The other was submitted by Diversified Holding, LLC ("Diversified"), an entity organized by the Greenbergs but funded by Macquarie Equipment Capital, Inc. ("Macquarie"), an entity unaffiliated with the Debtors.

25. On July 22, 2025, Diversified submitted a formal letter of intent which, upon information and belief, has been refined several times following negotiations between the Debtors and the Greenbergs (as amended, modified, or refined, the "LOI"). In the transaction contemplated by LOI (the "Going-Concern Transaction"), Macquarie would purchase the Debtors' equipment assets and lease those assets to Diversified.

26. With respect to a potential liquidation, the Debtors received two bids on July 22, 2025. One was submitted by Gordon Brothers but the Debtors deemed it uncompetitive. The Debtors deemed the other liquidation bid, submitted by Hilco Commercial Industrial and Ritchie Brothers (respectively, "Hilco" and "Ritchie Brothers" and such bid, the "Hilco/Ritchie Brothers Bid"), to be competitive with the Going-Concern Transaction.

27. On August 8, 2025, Gordon Brothers asked the Debtors if they could speak with the ABL Lenders about buying their claims and provided the Debtors with a term sheet to that effect (the "GB Term Sheet"). On August 11, 2025, with the Going-Concern Transaction uncertain and the ABL Lenders' unwilling to engage on the Hilco/Ritchie Brothers Bid, the Debtors provided the GB Term Sheet to the ABL Lenders as required under the then-operative forbearance agreement.

28. On August 13, 2025, (a) Diversified provided a revised LOI to the Debtors, and (b) Macquarie provided a separate "high confidence" letter with respect to the financing of the proposed Going-Concern Transaction. The Debtors delivered those documents to the ABL Lenders the following day and offered to discuss them with the ABL Lenders.

29. On August 15, 2025, the Debtors presented the ABL Lenders with a monetization plan that would effectuate a liquidation sale under the terms of the Hilco/Ritchie Brothers Bid. The Debtors informed the ABL Lenders that the Hilco/Ritchie Brothers Bid was the

best liquidation offer based on specified criteria and contemplated consummating a sale as part of a bankruptcy with Hilco and Ritchie Brothers serving as the stalking horse bidders.

30. On the same day, the ABL Lenders asked the Debtors for permission to speak with Gordon Brothers about a potential sale of their claims. The Debtors told the ABL Lenders that while they did not object to discussions on the topic, they could only be undertaken "with the understanding that [the Debtors] were not consenting to any transaction" at that time.

31. On August 18, 2025, following further negotiations, the Debtors received a revised LOI from Diversified and sent it to the ABL Lenders the same day.

32. On August 22, 2025, the Debtors informed the ABL Lenders that they had signed the latest version of Diversified' s LOI. The Debtors provided the ABL Lenders with (a) a copy of the executed LOI with Diversified, (b) an analysis comparing the Going-Concern Transaction to the Hilco/Ritchie Brothers Bid (the "Comparative Analysis"), and (c) an initial 13-week cash flow budget as required by the then-operative forbearance agreement.

33. The Comparative Analysis reviewed the economic aspects of the viable bids and concluded that the Going-Concern Transaction provided the Debtors with the greatest total economic value and would provide for higher and faster recoveries for the ABL Lenders and general unsecured creditors as compared to the Hilco/Ritchie Brothers Bid. The Comparative Analysis also identified several indirect, non-economic benefits of the Going-Concern Transaction, including operational continuity, the retention of approximately 70% of the Debtors' employees, and the avoidance of substantial costs and expenses.

34. Notwithstanding the execution of the LOI and the conclusions set forth in the Comparative Analysis, the Debtors informed the ABL Lenders that they would nevertheless continue to negotiate with Hilco and Ritchie Brothers in the interest of keeping all options open.

35. On August 29, 2025, the Debtors proposed to the ABL Lenders that the

forbearance period be extended from September 5 to October 5, 2025, in order to allow the Debtors to close on the Going-Concern Transaction. The Debtors included strict milestones that required the Debtors to pivot to the liquidation plan embodied by the Hilco/Ritchie Brothers Bid if any of the milestones were breached and remained uncured for 48 hours.

36. Rather than addressing the terms of the Debtors' proposed amendment to the forbearance agreement, the ABL Lenders inquired as to the location of the Debtors' equipment. In response, the Debtors told the ABL Lender that the information was requested but that, from their perspective, it didn't seem to make economic sense to close yards and move equipment before a decision to liquidate had been made and without the benefit of the automatic stay. Concerned by the apparent motives underlying the ABL Lenders' inquiry, the Debtors also specifically stated that "the NDA between [Gordon Brothers] and [the Debtors] does not allow [Gordon Brothers] to buy the ABL debt without [the Debtors'] consent. Doing so would be a violation of that agreement."

37. The ABL Lenders admitted as much, telling the Debtors: "We understand that. Do you anticipate that the [Debtors] would object?" In response, the Debtors stated: "We obviously have to see the proposal. The Board will have to consider the effect of the sale and will act in accordance with its fiduciary duties . . . the Board will have trouble approving a sale that does not provide a path for responsibly operating and/or winding down the company."

38. On September 3, 2025, ignoring the Debtors' August 29 proposal to extend the forbearance period, the ABL Lenders proposed a two-week extension of the forbearance period (from September 5 to September 19, 2025), but conditioned the extension on the Debtors' pre-agreement that the ABL Lenders could sell their claims against them to Gordon Brothers on any terms that the ABL Lenders and Gordon Brothers might agree.

39. Within hours, the Debtors rejected the ABL Lenders' proposal but proposed

a three-week extension during which it would (a) negotiate with Gordon Brothers and Hilco over a possible post-sale wind down or restructuring process, and (b) agree to a sale of the ABL Lenders' claims to either liquidator if a wind down or restructuring plan satisfactory to the Debtors were agreed upon. The Debtors also expressly stated that they were prepared to "engage in good faith [negotiations] with Gordon Brothers to see if a post-sale agreement could be reached but cannot provide a blanket consent to a sale without any idea what happens thereafter, especially for a mere two-week forbearance. Importantly, we understand Hilco may also be interested in a note sale. Further, we note that the Diversified bid remains active."

40. On September 4, 2025, the Debtors informed the ABL Lenders that Macquarie was going to seek credit committee approval to finance the Going-Concern Transaction. Later that day, the ABL Lenders told the Debtors that they would not accept any of the Debtors proposed changes to the terms of the forbearance extension but, of course, remained willing to "move forward" on their own terms—without any agreement or even discussion on an actual wind down or restructuring plan.

41. On September 5, 2025, the ABL Lenders and Gordon Brothers signed a letter of intent (the "ABL/GB LOI") limiting any forbearance to two weeks and prohibiting the ABL Lenders from consenting to the Going-Concern Transaction, the Hilco/Ritchie Brothers Bid, or any other transaction involving the ABL Lenders' debt or collateral. The ABL Lenders told the Debtors that the ABL/GB LOI contained an "exclusivity" provision but refused to disclosed the specific terms, just as they had refused to disclosed the terms of the proposed sale of their debt to Gordon Brothers.

42. At the end of the day, the then-existing forbearance agreement expired by its terms and without any extension leaving the Debtors unable to continue operating for long given the ABL Lenders' daily cash sweeps of the Debtors' bank accounts.

43. On September 8, 2025, the ABL Lenders refused to budge and urged the Debtors' Restructuring Committee to reconsider and blindly consent to the ABL Lenders' sale of their debt to Gordon Brothers in exchange for a two-week extension of the forbearance period.

44. The following day, the Debtors informed the ABL Lenders that Macquarie's credit committee had approved the financing of the proposed Going-Concern Transaction, and supplied a copy of Macquarie's letter establishing that fact. The Debtors followed up early on September 10 and, after noting the lack of any response from the ABL Lenders, noted that Macquarie remained "very committed to the Diversified deal" and was willing to speak directly with the ABL Lenders.

45. Rather than engaging, the ABL Lenders dug in further, telling the Debtors only that they required the Debtors' prior blind consent to the sale of the ABL Lenders' debt to Gordon Brothers.

46. In a bind, the Debtors asked the ABL Lenders whether they would indemnify the Debtors' officers and directors against any claims arising from the Debtors' pre-consent to a sale of the ABL Lenders' debt to Gordon Brothers. The ABL Lenders refused. The Debtors' also told the ABL Lenders that their "strong-arm tactics are simply not productive. We request, once again, that the [ABL] Lenders reconsider and provide the Company with a short forbearance so that it can continue to operate while pursu[ing] the best value maximizing option."

47. Without a substantive response or other path forward, the Debtors were forced to file for bankruptcy protection on September 11, 2025.

48. After the Petition Date, Plaintiff, in accordance with its statutory duties, conducted an analysis of the validity and priority of the alleged first-priority liens of the ABL Lenders. Plaintiff has identified certain assets of the Debtors on which the ABL Lenders do not have liens including: (a) commercial tort claims, (b) the operating account at Regions Bank, (c)

D&O insurance policies, (d) 35% of any foreign subsidiary, and (e) any rolling stock as to which the ABL Administrative Agent does not hold the title document or is otherwise not reflected as lienholder on the applicable title document (collectively, the "<u>Unencumbered Assets</u>").

## CAUSES OF ACTION

### COUNT 1
**(Against ABL Lenders)**
**Breach of the Duty of Good Faith and Fair Dealing**
**Derivative Claim**

49. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

50. The Forbearance Agreements were binding, valid contracts between the ABL Lenders and the Debtors.

51. The Forbearance Agreements were intended to provide the Debtors with time to pursue a going-concern or orderly liquidation of their assets.

52. As alleged above, the ABL frustrated the purpose of the Forbearance Agreements, and breached their duty of good faith and fair dealing (as applicable under New York law), by preventing the Debtors from pursuing a going-concern or orderly liquidation of their assets. Specifically, the ABL Lenders refused to consider either the Going-Concern Transaction or the Hilco/Ritchie Brothers Bid—even though those transactions maximized value for all stakeholders, including the ABL Lenders, and were otherwise in the Debtors' best interests.

53. Instead, the ABL Lenders insisted that the Debtors consent to a sale of their debt to Gordon Brothers, and that the Debtors do so with no plan for an orderly wind down or restructuring process. The Debtors did not enter into the Forbearance Agreements for the ABL Lenders' exclusive benefit. The ABL Lenders breached their duty of good faith and fair dealing, and prevented the Debtors from receiving the benefits of the Forbearance Agreements, by rejecting

all options other than the ABL Lenders' sale of debt to Gordon Brothers and by refusing to allow the Debtors to negotiate a soft landing following such sale.

54. The Debtors performed all obligations under the Forbearance Agreements.

55. The ABL Lenders' wrongful conduct harmed the Debtors in an amount to be determined at trial.

### COUNT 2
### (Against ABL Lenders)
### Tortious Interference with Contract
### Derivative Claim

56. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

57. The NDA is a valid, binding contract between Gordon Brothers and the Debtors. The NDA included the bargained-for GB Restrictions.

58. At all relevant times, the ABL Lenders knew of the existence and terms of the NDA.

59. The ABL Lenders intentionally and unjustifiably interfered with the Debtors' rights under the NDA by (a) negotiating with Gordon Brothers with respect to the sale of their debt in violation of the NDA, and (b) insisting that the Debtors waive the GB Restrictions as a condition to the extension of the Forbearance Agreements.

60. The ABL Lenders' tortious interference with the Debtors' rights under the NDA harmed the Debtors in an amount to be determined at trial.

### COUNT 3
### (Against Gordon Brothers)
### Breach of Contract
### Derivative Claim

61. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

62. The NDA is a valid, binding contract between Gordon Brothers and the Debtors. The NDA included the bargained-for GB Restrictions.

63. As alleged above, Gordon Brothers breached the GB Restrictions.

64. The Debtors fulfilled all of their obligations under the NDA.

65. Gordon Brothers' breach of the GB Restrictions under the NDA harmed the Debtors in an amount to be determined at trial.

## COUNT 4
### (Against ABL Lenders and Gordon Brothers)
### Civil Conspiracy

66. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

67. The ABL Lenders and Gordon Brothers agreed to unlawfully frustrate the purpose of the Forbearance Agreements, breach the GB Restrictions, and otherwise interfere with the Debtors' rights under the NDA.

68. Among other things, the ABL Lenders and Gordon Brothers entered into the ABL/GB LOI that included an "exclusivity" provision and that otherwise interfered with the Debtors' ability to fulfill its fiduciary duty to facilitate a going-concern or orderly liquidation sale of its assets.

69. The unlawful agreement between the ABL Lenders and Gordon Brothers proximately caused of damages to the Debtors in an amount to be determined at trial.

## COUNT 5
### (Against ABL Lenders)
### Equitable Subordination
### 11 U.S.C. § 510(c)(1)

70. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

71. The equities of this case demand that the liens and claims of the ABL Lenders against the Debtors should be equitably subordinated to all other claims except those of equity holders under section 510(c) of the Bankruptcy Code.

72. The ABL Lenders engaged in inequitable conduct by breaching their duties of good faith and fair dealing, interfering with the Debtors' rights under the NDA, conspiring with Gordon Brothers to beach the GB Restrictions, and by otherwise preventing the Debtors from fulfilling their fiduciary duties to maximize value through a going-concern or orderly liquidation transaction—all while trying to force the Debtors to act against their own interests by waiving the GB Restrictions without a "day after" plan.

73. Based on the forgoing, ABL Lenders' claims should be equitably subordinated to all other claims except those of equity holders is consistent with section 510(c) of the Bankruptcy Code.

**COUNT 6**
**(Against ABL Lenders)**
**Disallowance of Claims of ABL Lenders and Transfer of Liens to Estate**
**11 U.S.C. §§ 502(b)(1) and 510(c)(2)**

74. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

75. The ABL Lenders engaged in inequitable conduct by breaching their duties of good faith and fair dealing, interfering with the Debtors' rights under the NDA, conspiring with Gordon Brothers to beach the GB Restrictions, and by otherwise preventing the Debtors from fulfilling their fiduciary duties to maximize value through a going-concern or orderly liquidation transaction—all while trying to force the Debtors to act against their own interests by waiving the GB Restrictions without a "day after" plan.

76. Based on the forgoing, ABL Lenders' claims are not enforceable under New York or any other applicable law, and therefore, the ABL Lenders' claims can be disallowed in

accordance with 11 U.S.C. § 502(b)(1) and any liens of the ABL Lenders must be transferred to the Debtors' estates pursuant to 11 U.S.C. § 510(c)(2).

## COUNT 7
### (Against ABL Lenders)
### Declaratory Judgment Concerning Unencumbered Assets
### 28 U.S.C. §§ 2201 and 2202

77. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

78. The collateral of the ABL Lenders under the ABL Security Documents does not include, and/or the ABL Lenders have failed to perfect their asserted liens, claims, and interests in, the Unencumbered Assets.

79. Plaintiff objects to the liens and claims asserted by the ABL Lenders against the Debtors or their estates to the extent inconsistent with the foregoing.

80. Accordingly, an actual, substantial, and justiciable controversy exists between Plaintiff and the ABL Lenders concerning the validity, priority, or extent of the ABL Lenders' liens, claims and interests.

81. Such a controversy is sufficient to warrant the issuance of a declaratory judgment consistent with Plaintiff's allegations herein that the ABL Lenders have no lien or security interest in the Unencumbered Assets.

## COUNT 8
### (Against ABL Lenders)
### Avoidance of Liens With Respect to Unencumbered Assets
### 11 U.S.C. §§ 544, 550, and 551

82. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

83. Pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code and the Standing Order, the Committee (acting on behalf of the Debtors' estates), as of the Petition Date, and without regard to any knowledge of the Debtors, any trustee, or any other creditors, has the

rights and powers of, or may avoid any transfer of property of the Debtors or any obligation incurred by the Debtors that is voidable by:

> A creditor that extends credit to a debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; or

> A creditor that extends credit to a debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against a Debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

84. The collateral of the ABL Lenders under the ABL Security Documents does not include, and/or the ABL Lenders have failed to perfect their asserted liens, claims, and interests in, the Unencumbered Assets.

85. Because the ABL Lenders do not have properly perfected liens on, or security interests in, the Unencumbered Assets, any and all liens on and security interests in the Unencumbered Assets should be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property or the value of such property, if previously transferred, should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

**WHEREFORE**, by reason of the foregoing, Plaintiff requests that the Court enter an order and judgment:

(1) On Count 1, in Plaintiff's capacity as representative of the Debtors, judgment in favor of the Debtors for damages in an amount to be determined at trial caused by the ABL Lenders' breach of the duty of good faith and fair dealing;

(2) On Count 2, in Plaintiff's capacity as representative of the Debtors, judgment in favor of the Debtors for damages in an amount to be determined at trial caused by the ABL Lenders' tortious interference with the Debtors' rights under the NDA;

(3) On Count 3, in Plaintiff's capacity as representative of the Debtors, judgment in favor of the Debtors for damages in an amount to be determined at trial caused by Gordon Brothers' breach of their obligations the NDA;

(4) On Count 4, in Plaintiff's capacity as representative of the Debtors, judgment in favor of the Defendants for damages in an amount to be determined at trial caused by their unlawful conspiracy;

(5) On Count 5, judgment in favor of Plaintiff and against all ABL Lenders equitably subordinating all of the ABL Lenders' liens and claims in the Debtors' cases to the level of equity interests pursuant to section 510(c) of the Bankruptcy Code;

(6) On Count 6, judgment in favor of Plaintiff and against all ABL Lenders disallowing the claims of the ABL Lenders and transferring any liens or security interests of the ABL Lenders on the Debtors' assets to the Debtors' estates;

(7) On Count 7, declaring that the certain property of the Debtors is not subject to liens or security interests asserted by the ABL Lenders;

(8) On Count 8, determining that liens or security interests asserted by the ABL Lenders on certain property of the Debtors are unperfected and should be avoided; and

(9) granting Plaintiff such other and further relief as the Court deems just, proper, and equitable, including the costs and expenses of this action.

(remainder of page intentionally left blank)

Dated: October 21, 2025

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES, LLP**

*/s/  Maxim B. Litvak*
Judith Elkin (TX Bar No. 06522200)
Maxim B. Litvak (TX Bar No. 24002482)
Benjamin L. Wallen (TX Bar No. 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile:  (713) 691-9407
Email:  jelkin@pszjlaw.com
           mlitvak@pszjlaw.com
           bwallen@pszjlaw.com

-and-

Bradford J. Sandler (admitted *pro hac vice*)
Robert J. Feinstein (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email:      bsandler@pszjlaw.com
            rfeinstein@pszjlaw.com
            jmorris@pszjlaw.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*